UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

FRANCES JAKEL-TAYLOR,        )
                             )
            Plaintiff        )
                             )
        v.                   )  Case No. 2:05 cv 2
                             )
JO ANNE B. BARNHART,         )
COMMISSIONER OF SOCIAL SECURITY )
                             )
            Defendants       )

OPINION AND ORDER

This matter is before the court on the Motion for Summary Judgment filed by the plaintiff, Frances Jakel-Taylor, on May 25, 2005. For the reasons set forth below, the motion is **GRANTED**. This matter is **REMANDED** with the instruction that Supplemental Security Income and Disability Insurance Benefits be **AWARDED**.

Background

The plaintiff, Frances Jakel-Taylor, initially applied for Disability Insurance Benefits and Supplemental Security Income on July 9, 1997, alleging a disability onset date of November 4, 1996. (Tr. 166) The claim was denied initially on September 9, 1997 and upon reconsideration on January 24, 1998. (Tr. 106, 108) Jakel-Taylor requested a hearing before an Administrative Law Judge on February 27, 1998, and a hearing was held before ALJ Bryan J. Bernstein on January 7, 1999. (Tr. 141, 28) Subsequent to the hearing in which Jakel-Taylor and Vocational Expert ("VE") Randall Strahl testified, the ALJ denied Jakel-Taylor's application by written decision dated January 29, 1999. (Tr. 109-119) On

March 10, 1999, Jakel-Taylor requested that the Appeals Council review the ALJ's decision, and on January 23, 2001, the Appeals Council granted the request, vacated the ALJ's decision, and remanded the case for further proceedings. (Tr. 148, 154-157) A second hearing was held before the ALJ on August 13, 2002, at which Jakel-Taylor and VE Edward Pagella testified. (Tr. 57) On January 23, 2003, the ALJ again denied Jakel-Taylor's application. (Tr. 11-27)  The Appeals Council finally rejected Jakel-Taylor's application on October 7, 2004. (Tr. 5) Jakel-Taylor filed her complaint in this court on May 25, 2005.

Jakel-Taylor was born on August 20, 1952 and is now 53 years old. (Tr. 166) She has one daughter by a previous marriage. (Tr. 167) Jakel-Taylor completed high school and two years of college. (Tr. 193) She worked as a Customer Service Representative for Northern Indiana Public Service Company (NIPSCO) for 19 years but was fired for allegedly falsifying a medical claim in November 1996. (Tr. 35, 43)  The same year, Jakel-Taylor was in an automobile accident and was prescribed Lortab for an injury to her back. (Tr. 81) She became addicted to Lortab, and after her doctor discontinued the prescription in 1999, she called in the Lortab prescription herself and was arrested for prescription fraud. (Tr. 81, 296)  Jakel-Taylor was arrested and ultimately served 18 months in the Indiana Women's Prison. (Tr. 76, 296)

In 1997, Jakel-Taylor became licensed to sell real estate (Tr. 37, 69) However, she only sold one house and ultimately decided to stop because she would set appointments and then miss

2

them, at times for fear of leaving her home and because she was unable to focus. (Tr. 34, 37)  She also attempted to work as a salesperson in 1999, but she resigned following an incapacitating panic attack that began when she saw people from NIPSCO walk into the store. (Tr. 74, 101-02)  Jakel-Taylor cites the loss of her job with NIPSCO in 1996 as the beginning point of her disability. (Tr. 176)

Two weeks after her termination from NIPSCO, Jakel-Taylor sought treatment from Dr. Renee Hill for symptoms of sadness, hopelessness, crying spells, insomnia, and anorexia. (Tr. 241) Dr. Hill noted that Jakel-Taylor was a little disheveled, had a depressed mood, a sad effect, and was tearful throughout her appointment.  She diagnosed Jakel-Taylor with "296.33" at Axis I, which is Major Depressive Disorder, prescribed Remeron, and ordered Jakel-Taylor to return in two weeks (Tr. 241) In February of 1997, Dr. Hill reported that Jakel-Taylor was less depressed and anxious but that she did not feel completely stable and still felt vulnerable, particularly when confronted with the subject of her former employer. (Tr. 242) Dr. Hill noted that Jakel-Taylor's medication was not completely effective. (Tr. 242) Dr. Hill discontinued Remeron and prescribed Paxil. (Tr. 242)

 Dr. Dwenzar Howard treated Jakel-Taylor on a monthly basis from April 1997 to April 1998. (Tr. 243-252) On July 9, 1997, Jakel-Taylor reported that she had been "very depressed and anxious" since a NIPSCO arbitrator had ruled against her in her termination appeal and that she felt worse since prior to treat-

3

ment.  Dr. Howard continued Prozac and increased Jakel-Taylor's dosage of Xanax. (Tr. 252)

On August 25, 1997, Dr. Howard completed a Report of Psychiatric Status for the Disability Determination Bureau ("DDB") in which he diagnosed Jakel-Taylor with major depression and severe psychological stressors. (Tr. 243) He reported that Jakel-Taylor's symptoms began in November of 1996 and grew worse since that time. (Tr. 245) Dr. Howard observed that Jakel-Taylor had good grooming, was cooperative and easy to engage, had spontaneous speech and goal-directed thought processes, but that she nevertheless had difficulty getting motivated, cried and worried a lot, and experienced insomnia. (Tr. 244) Dr. Howard indicated that Jakel-Taylor's concentration was poor, and though she was able to perform the activities of daily living, she was unable to attend to a simple, repetitive task continuously for a two-hour period. (Tr. 247)

Also in August 1997, Jakel-Taylor completed an Activities of Daily Living Report in which she stated that her activities were limited to some housecleaning, laundry, and reading. (Tr. 216) She stated that she did not cook, had no hobbies, and had withdrawn from her friends. (Tr. 216-218)

On September 5, 1997, a DDB representative spoke with Jakel-Taylor's daughter who stated that Jakel-Taylor still cried about once a week over her job termination, would become "down in the dumps" for several days when former coworkers would call her to report other employees' terminations, and would have memory or

4

concentration problems when she thought about her former job.
(Tr. 214-15)

On September 8, 1997, non-examining and non-treating psychi-
atrist Dr. W. Shipley, completed a Psychiatric Review Technique
for the DDB in which Dr. Shipley noted that Jakel-Taylor suffered
from major depression but did not meet a Listing. (Tr. 229) Dr.
Shipley opined that based on the record, Jakel-Taylor demon-
strated slight limitations in daily living activities and social
functioning, seldom experienced concentration deficiencies, and
never had an episode of deterioration or decompensation in a
work-like setting. (Tr. 232, 236)

Following the first denial of her claim, Jakel-Taylor
submitted a Request for Reconsideration on October 20, 1997,
indicating that she experienced days when she did not get out of
bed or shower. (Tr. 205) She stated that she "hides" because she
did not want to face anyone, and out of fear, did not answer the
telephone. (Tr. 205)

In November 1997, Jakel-Taylor reported feeling depressed
50% of the time but told Dr. Howard that she had gotten her real
estate license and was attempting to go on with her life.  Dr.
Howard diagnosed Jakel-Taylor with major depression, increased
her Prozac, and recommended individual therapy.  He further
observed that she "still has great difficulty concentrating and
is depressed. This may affect her performance at any job."
However, he noted that she still could perform activities of
daily living and function independently. (Tr. 251)

5

In December 1997, Jakel-Taylor attempted suicide by taking ten Xanax tablets after she was charged with possession of stolen property and placed on leave from her job, presumably selling real estate.  Dr. Howard found that she was "more depressed and anxious" and increased her Xanax and Prozac prescriptions. (Tr. 250) However, two months later, Jakel-Taylor was admitted to the hospital for 24 hours for depression and suicidal ideation. (Tr. 250)  By April 29, 1998, Jakel-Taylor still was reporting "depression, crying spells, anxiety, and difficulty concentrating." (Tr. 249) Dr. Howard repeated his recommendation of individual therapy and continued her prescriptions. (Tr. 249)

In January 1998, Jakel-Taylor completed a second Activities of Daily Living Report in which she stated that she continued to engage in household activities including laundry, but required assistance from her daughter because of the length of time that it took her to complete the task. (Tr. 209) She noted that she frequently rescheduled or canceled appointments because she could not "get out of bed and get dressed or face anyone." (Tr. 211) She further stated that when she would start driving to one location, she would end up driving somewhere totally different because she was thinking of something else, and that she had continued to withdraw from her friends. (Tr. 209-12)

On May 22, 1998, Dr. Howard completed a Mental Residual Functional Capacity ("RFC") statement for the DDB. (Tr. 253) He reported that Jakel-Taylor had good ability to follow work rules, relate to co-workers, use judgment, and function independently,

6

but only a fair ability to deal with the public or interact with supervisors, and no ability to deal with work stresses, maintain attention, or concentrate. (Tr. 253) He also stated that, due to anxiety and depression, she maintained no ability to understand, remember, or carry out even simple job instructions. (Tr. 254) He commented that Jakel-Taylor was "very depressed and anxious. Her symptoms are exacerbated when she feels overwhelmed and this subsequently affects the way she is able to do her job.  At this time minor stressors lead to an increase in her depression and anxiety." (Tr. 254) He further noted that she had poor to no predictability as to how she would relate in social situations and that, when stressed, she had thoughts of suicide. (Tr. 255)

On August 31, 1998, and again on September 22, 1998, Life Investors Insurance Company of America, who had paid Jakel-Taylor's disability benefits on behalf of her former employer, requested information from Dr. Terri Pellow, a treating psychia-trist. (Tr. 261) On October 22, 1998, Dr. Pellow reported that Jakel-Taylor was not capable of returning to work, that she had failed at previous work attempts due to poor concentration, and that she was taking Prozac, Xanax, and Buspar.  Dr. Pellow described the prognosis that Jakel-Taylor would return to work in three to six months as "poor," and in the next 24 months as "guarded." (Tr. 260, 261) On November 24, 1998, Dr. Pellow examined Jakel-Taylor and completed another form for Life Inves-tors indicating that Jakel-Taylor suffered from major depression

and panic disorder and could not return to work for at least a
year. (Tr. 258)

During the ALJ hearing on January 7, 1999, Jakel-Taylor
testified that she regularly cried once or twice a day, no longer
socialized with friends because she "did not want to be around
them," and that, although attending church regularly, she did not
socialize with fellow church members. (Tr. 45-46) She said that
she had difficulty focusing on projects, had frequent migraines,
slept only one or two hours at a time, cried once or twice a day,
and would get nervous when she talked to people. (Tr. 39, 43-44)
She said that she cooked, drove, and did housework, and that she
liked to read. (Tr. 39)  She stated that on good days, she was
able to get up, shower and take her daughter to school, but that
these days occurred with about as much frequency as bad days.
(Tr. 46-48) On bad days, she would stay in bed and not answer the
phone. (Tr. 47) She noted her hospitalization in 1998, but also
testified that it had been approximately three months since she
last suffered a panic attack. (Tr. 48-50)

Because the Appeals Council remanded the first ALJ decision,
the VE's testimony at the first hearing and the ALJ's subsequent
decision is omitted from this opinion.

In the January 29, 2001 remand Order, the Appeals Council
criticized ALJ Bernstein for giving little weight to the opinions
by Jakel-Taylor's treating physicians regarding her ability to
concentrate and the frequency of task-related errors.  It also
found that ALJ Bernstein should not have discounted these sources

8

as solely informed by Jakel-Taylor's own descriptions of her symptoms because the treating physicians in fact all had additional opportunity to observe and evaluate Jakel-Taylor. The Appeals Council then directed ALJ Bernstein to (1) resolve these issues, (2) obtain additional records where appropriate, (3) seek further information from a VE, (4) ask the VE whether his testimony conflicted with the Dictionary of Occupational Titles ("DOT"), and (5) resolve any differences.  (Tr. 154-57)

On October 27, 2001, Dr. S. Jayachandran, Jakel-Taylor's treating psychologist, completed an Initial Psychiatric Assessment and Treatment Plan for Jakel-Taylor. (Tr. 275-280) Dr. Jayachandran noted that Dr. Pellow had prescribed Prozac for Jakel-Taylor and that Dr. Nicholas Abid prescribed Lithium in June 2001. (Tr. 275) Dr. Jayachandran indicated that Jakel-Taylor was depressed and anxious but had not exhibited suicidal ideation. (Tr. 276, 277) He diagnosed her with Bipolar II disorder with the "most [illegible] episode depressed" and reported her GAF at 60. (Tr. 278)

On April 9, 2002, Dr. Craig Nordstrom performed a consultative mental status exam on behalf of the DDB during which he administered the Minnesota Multiphasic Personality Inventory ("MMPI-II"). (Tr. 269) Jakel-Taylor told Nordstrom that she slept only a couple hours each evening and occasionally would not sleep for two to three days.(Tr. 265) She also reported "anhedonia, feelings of hopelessness, helplessness, worthlessness; low energy; poor concentration; poor appetite; and suicidal idea-

9

tion," though such ideation was not currently occurring. (Tr.
265) Jakel-Taylor further described a tendency to clean house at
a frenetic pace or "engage in high-risk behaviors (driving too
fast)" on an average of once every other week. (Tr. 265) She
reported that she often let cleaning go and that she did not go
shopping because she was afraid of seeing anyone from NIPSCO.
(Tr. 267) Her mental status examination was normal except that
she could not recall three objects after five minutes, could not
do serial sevens, and had a subdued mood with a "flat to mildly
broad" affect. (Tr. 266)

Jakel-Taylor's MMPI-II results included an F scale reading
that indicated "a state of confusion or a plea for help and a
protocol of questionable validity" and K scale scores that sug-
gested she "may be exaggerating problems as a plea for help or
may feel confused about her situation." (Tr. 267) Dr. Nordstrom
opined that the overall validity of the test should be viewed
with some caution because Jakel-Taylor may be "over-endorsing"
her symptoms. (Tr. 267) Nevertheless, he found that her MMPI
profile indicated depression, anxiousness, and fatigue. (Tr. 269)
Dr. Nordstrom diagnosed Jakel-Taylor with Major Depressive
Disorder, recurrent, severe without psychotic features; post-
traumatic stress disorder, chronic; and remission from opoid
dependence. (Tr. 269) He reported her GAF at 50, with also
highest GAF of 50 in the past year. (Tr. 269)

On April 9, 2002, Dr. Nordstrom also completed a Mental RFC
in which he noted that Jakel-Taylor demonstrated no limitation in

her ability to understand, remember, or carry out simple instruc-
tions. (Tr. 272) He noted slight limitation in carrying out
detailed instructions and moderate limitations in Jakel-Taylor's
ability to understand and remember detailed instructions and make
judgments on simple work-related decisions. (Tr. 272) Dr. Nord-
strom supported the assessment by noting that she demonstrated
poor concentration and hypervigilance concerning seeing persons
she does not want to encounter. (Tr. 272) Dr. Nordstrom further
concluded that she suffered slight limitations in interacting
with the public and co-workers and responding to changes in a
routine work setting. (Tr. 273) He noted moderate difficulties in
interacting with supervisors and responding to work pressures.
(Tr. 273)

During her second hearing before ALJ Bernstein on August 13,
2002, Jakel-Taylor testified that while incarcerated she was
under the treatment of a psychologist and psychiatrist, who
because of the expense, discontinued her Prozac prescription and
placed her on Lithium. (Tr. 82) She also testified that after
being released from prison, she was under the care of Dr. S.
Jayachandran, who continued her Lithium prescription and also
added Prozac and Trileptral. (Tr. 83) Jakel-Taylor testified that
since prison, her depression had increased. (Tr. 91) While she
noted that she had not had a recent panic attack or suicidal
thoughts, she continued to have days once or twice every other
week in which she could not get out of bed, as well as manic
episodes once every two to three weeks. (Tr. 71, 89-91) She

11

described her activities as reading novels during the day and going to church once a week, but she said that she would sit in the car if she accompanied her daughter shopping. (Tr. 77-78) She cried at least twice during the ALJ hearing. (Tr. 87, 92)

Following Jakel-Taylor's testimony, the ALJ asked VE Edward Pagella to define the erosion of jobs for a person who was unable to work with the public and unable to work in "closely regimented pace productions," which the ALJ described as jobs that "impose a stressful relationship due to the pace or quality of the work demanded." (Tr. 98) Based on these limitations, VE Pagella testified that 75 percent of all sedentary, light, and medium jobs would be unavailable. (Tr. 97, 99) He further clarified that no service jobs would be available, 75 percent of manufacturing jobs would be eroded, but all clerical jobs would remain open. (Tr. 98) In sum, the ALJ noted that Jakel-Taylor could perform 11,650 light level jobs in the Northwest Indiana/Chicago Metro-politan region in addition to 7,000 jobs as a mail sorter and 6,300 jobs as a file clerk. (Tr. 98-99) On cross-examination, the VE acknowledged that no substantial gainful activity would be available to a person who, because of a psychiatric condition, was unable to work on average of one to two days every other week. (Tr. 99) The ALJ did not ask the VE whether his testimony was consistent with the DOT.

In his second decision denying benefits issued January 23, 2003, the ALJ found that Jakel-Taylor had severe impairments of depression, anxiety, and posttraumatic stress disorder at Step

12

Two.  However, she did not meet the Listing requirements under
12.04 (depression) or 12.06 (anxiety/posttraumatic stress disor-
der) at Step Three because she did not exhibit marked limitation
in two of the four "B" listing criteria or an extreme limitation
in any one of the criteria, including activities of daily living,
social functioning, concentration, persistence and pace, or
episodes of decompensation. (Tr. 16)

     In determining Jakel-Taylor's residual functional capacity
at Step Four, the ALJ found that she was not credible.  (Tr. 17)
He stated that she had described migraine headaches and an
inability to stay focused and complete work during the first
hearing, and that she had described depression, panic symptoms,
sloppiness, carelessness, and a fear that she might encounter
people she knew from NIPSCO at the second hearing.  (Tr. 17)
However, the ALJ noted that she also "appeared for her hearings
dressed professionally" and that her MMPI test results "indicated
exaggeration of symptoms of emotional distress."  (Tr. 17) He
further stated that her past criminal record implied a "deceitful
character and a contempt for authority." (Tr. 17) He found that
Jakel-Taylor had a pattern of dishonesty in her life, citing her
termination from NIPSCO for a fraudulent health claim, incarcera-
tion, and then a charge for possession of stolen property. (Tr.
18) He also opined that she did not appear as disabled as she
alleged because she had obtained a real estate license, worked in
retail sales, recruited volunteers, and continued to look for
work. (Tr. 18) He then concluded that neither Jakel-Taylor's

testimony nor "the opinion of professionals who have founded their evaluation upon the claimant's reportage" could be accorded persuasive weight. (Tr. 17)

Turning back to the "B Criteria" for the Listings at Step Three, the ALJ found that Jakel-Taylor did not have deficiencies in activities of daily living because "she takes care of her personal needs and household chores, cooks, reads novels, drives a car, and goes to church on Sundays" and because Dr. Nordstrom's mental status evaluation essentially was normal. (Tr. 18) ALJ Bernstein next found that while the evidence showed moderate deficiencies in sustaining social functioning, Jakel-Taylor's despondent and suicidal gestures were "in response to being caught in illegal activities," and it was "not clear that [her physicians were] fully aware of the factors in her life." (Tr. 19) The ALJ rejected Dr. Nordstrom's and Dr. Howard's findings that Jakel-Taylor had difficulties in concentration, persistence, and pace because she could drive, attended church, attempted to work, had "school related activities," accepted volunteer re-cruiting responsibility, and read novels. (Tr. 19) Finally, he found that she had no episodes of decompensation in a work-like setting because her panic attack while working in retail was really caused by "embarrassment, not uncontrolled psychopatho-logy." (Tr. 19)

The ALJ then proceeded to discount the opinions of every single one of Jakel-Taylor's treating *and evaluating* physicians. He concluded that the record "did not present a unified theory of

14

impairment" because Jakel-Taylor's treating physicians had found
that she was diagnosed with "bipolar disorder, major depressive
disorder, post traumatic stress disorder, opioid dependence, and
anxiety," but that "none" of these treating physicians had "dealt
with the factor of her deceit," confirming once again for the ALJ
that Jakel-Taylor was "dishonest." (Tr. 18)

Specifically, he found that Jakel-Taylor had not been
"forthcoming" with Dr. Hill in 1996 because Jakel-Taylor did not
mention her addiction to opioids and did not acknowledge the
reason for her termination. (Tr. 20) He therefore found that Dr.
Hill "[did] not carefully address validity of the claimant's
reporting and fundamental psychological forces affecting her."

As for Dr. Howard, ALJ Bernstein concluded that the doctor
had better insight into Jakel-Taylor's condition than did Dr.
Hill, but that he "did not employ objective measures of her
pathology and he [did] not discuss the validity of her presenta-
tion." (Tr. 22) The ALJ similarly discounted Dr. Howard's report,
stating that his assessment was not based on objective measures
and demonstrated internal inconsistencies. (Tr. 22) The ALJ
stated that in the mental RFC Dr. Howard completed, he "observes
temporal deficiencies that are quite different from his earlier
observations in his notes." (Tr. 22) However, the ALJ did not
further indicate the source of inconsistency between the temporal
deficiencies and the earlier notes. He later discounted Dr.
Howard's records as "internally inconsistent and neither sup

15

ported by the medical evidence, nor by the evidence of record."
(Tr. 23)

ALJ Bernstein summarily dismissed the mental RFC completed
by Dr. Jayachandran because his notes did not address her "im-
pending criminal crisis" or her addiction to opiates. (Tr. 22)
According to the ALJ, Dr. Jaychandran merely related what Jakel-
Taylor had been telling other therapists. (Tr. 22) The ALJ also
rejected Dr. Nordstrom's evaluation and MMPI administration
because "[h]is findings are quite sympathetic and do not directly
address certain obvious issues.  These would be exaggeration as a
means of supporting her application for benefits, and the antiso-
cial features of her illegal conduct."  (Tr. 23) Paradoxically,
however, he found Dr. Nordstrom to have the best awareness of
Jakel-Taylor's history. (Tr. 23)

Finally, the ALJ rejected Dr. Pellow's observations as "less
than minimally useful" because they were not accompanied by a
detailed account of her examination and "appear conjectural and
plainly dependent upon brief observation and complaints by this
unreliable affiant." (Tr. 23)

The ALJ cited "discrepancies" between Jakel-Taylor's testi-
mony, the evidence of record, and the reports of her treating and
examining physicians because she was not having hallucinations,
appeared goal-directed, was oriented, and not displaying bizarre
thinking. (Tr. 24)  He then concluded that Jakel-Taylor retained
the ability to work at all exertional levels in jobs that did not
involve public contact and a closely regimented feature. (Tr. 24)

16

Based on this RFC, the ALJ held that jobs available to Jakel-Taylor included 11,600 general office worker positions, 7,200 mail sorter jobs, and 6,300 file clerk positions. (Tr. 25)

<u>Discussion</u>

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. §405(g)  ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive.");  *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003);  *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct 1420, 1427, 28 L.Ed.2d 852 (1972) (*quoting* **Consolidated Edison Company v. NLRB,** 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)).  *See also* **Sims v. Barnhart**, 309 F.3d 424, 428 (7th Cir. 2002);  **Green v. Shalala,** 51 F.3d 96, 101 (7th Cir. 1995).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law.  *Golembiewski*, 322 F.3d at 915; **Cannon v. Apfel,** 213 F.3d 970, 974 (7th Cir. 2000).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues."  **Lopez ex. rel. Lopez v. Barnhart**, 336 F.3d 535, 539 (7th Cir. 2003).

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act.  The claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability.  20 C.F.R. §§404.1520, 416.920.  The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. §§404.1520(b), 416.920(b).  If she is, the claimant is not disabled and the evaluation process is over; if she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities."  20 C.F.R. §§404.1520(c),  416.920(c).  Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations.  20 C.F.R. §401, pt. 404, subpt. P, app. 1.  If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling.  However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of her past work.  If,

18

at this fourth step, the claimant can perform her past relevant
work, she will be found not disabled. 20 C.F.R. §§404.1520(e),
416.920(e).  However, if the claimant shows that her impairment
is so severe that she is unable to engage in her past relevant
work, then the burden of proof shifts to the Commissioner to
establish that the claimant, in light of her age, education, job
experience and functional capacity to work, is capable of per-
forming other work and that such work exists in the national
economy.  42 U.S.C. §423(d)(2); 20 C.F.R. §§404.1520(f),
416.920(f).

        As a preliminary matter, the court notes that if an award of
benefits was not appropriate at this stage, it would be compelled
to remand for a third hearing in light of how clearly ALJ Bern-
stein ignored the mandates of the Appeals Council.  First, the
Appeals Council specifically instructed the ALJ not to discount
physician opinions on the sole basis that they heard Jakel-
Taylor's own descriptions of her symptoms, yet this is precisely
what the ALJ did on remand.  Beyond some cursory and unsupported
statements that physician records were "inconsistent," the ALJ
rejected the opinions of every single physician simply based on
his conclusion that Jakel-Taylor herself could not be relied
upon.  Second, the ALJ made no effort to ask the VE whether his
testimony conflicted with the DOT.  Ordinarily, this duty arises
only when the claimant notes a discrepancy. *Donahue v. Barnhart*,
279 F.3d 441, 446-47 (7th Cir. 2002). *See also Prochaska v.
Barnhart*, ____ F.Supp.2d ____, 2005 WL 901202, at *14 (W.D. Wis.

19

Apr. 19, 2005). However, here the Appeals Council specifically directed the ALJ to ask and resolve any such conflicts. (Tr. 155-57) The ALJ's failure to do so is cause for remand.  Regardless, because the court finds that the evidence in this case dictates a finding that Jakel-Taylor is disabled, no remand is required.

Even aside from Jakel-Taylor's own descriptions of her symptoms, the evidence in this case is totally consistent.  Dr. Hill observed Jakel-Taylor to be disheveled, depressed, sad, and tearful, diagnosed her with Major Depressive Disorder, and prescribed Remeron and Paxil. (Tr. 241-42) Dr. Howard, who treated Jakel-Taylor on a monthly basis for one year and completed at least two evaluations for the DDB, consistently diagnosed her with major depression, found that her concentration was poor and that she could not attend to a simple repetitive task for even two hours, and increased her prescriptions for Xanax and Prozac. (Tr. 243-47, 251-52) In 1997, Jakel-Taylor attempted suicide and spent the night in the hospital for suicidal ideation in 1998.  (Tr. 249-50) Once again, Dr. Howard noted that she had no ability to perform sustained work at even a simple level. (Tr. 254-55) Dr. Pellow similarly diagnosed Jakel-Taylor with major depression and a panic disorder and stated that she could not work due to poor concentration in 1998. (Tr. 258, 260-61) Also in 1997 and 1998, Jakel-Taylor had what could hardly be considered a successful work attempt when she managed to sell only one house during a two year period with a real estate license. (Tr. 34,37) In 1999, she had a second failed work

attempt when she quit her retail job after having a panic attack.
(Tr. 74, 101-02) In 2001, Dr. Jayachandran diagnosed Jakel-Taylor
with bipolar disorder with the "most" episode of depression and
reported her GAF at 60.  (Tr. 278) In 2002, Dr. Nordstrom as-
signed her GAF at 50, noted manic tendencies, and diagnosed her -
like Dr. Hill and Dr. Howard before him - with major depressive
disorder, as well as posttraumatic stress disorder and a remis-
sion from opioid dependence. (Tr. 267-69)  Like all previous
doctors, Dr. Nordstrom found Jakel-Taylor to have poor concentra-
tion and hyper-vigilence concerning former coworkers. (Tr. 272-
73)

     Critically, all of these physicians found that Jakel-Taylor
was goal-directed in her thinking processes, appropriately
dressed, had relevant speech, could perform her activities of
daily living, and did not have hallucinations. (Tr. 241, 244,
265) Despite these observations, all physicians maintained that
Jakel-Taylor had major depression (or bipolar disorder with
depression as a predominant feature), a GAF of 60 or lower, and
moderate to severe problems concentrating.  As for Jakel-Taylor's
ability to work, Dr. Hill and Dr.Jayachandran were silent on the
subject, treating physicians Dr. Howard and Dr. Pellow specifi-
cally stated that she could not perform any work, and even
evaluating physician Dr. Nordstrom found that Jakel-Taylor had
moderate difficulties in remembering, understanding, and carrying
out detailed instructions, making judgments on even *simple* work-

related decisions, and moderate difficulties responding to work pressures or interacting with supervisors. (Tr. 253-55, 258, 273)

Nevertheless, the ALJ declined to give any of these treating and evaluating physicians controlling weight.  A treating source's opinion is entitled to controlling weight if "the opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically accept-able clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record. 20 C.F.R. §404.1527(d)(2). *See also* ***Boiles v. Barnhart***, 395 F.3d 421, 426 (7th Cir. 2005); ***Books v. Chater***, 91 F.3d 972, 979 (7th Cir. 1996)(*quoting* ***Stephens v. Heckler***, 766 F.2d 284 (7th Cir. 1985))(holding that in comparison to the opinions of consultative examiners, "the ALJ must take into account the treating physi-cian's ability to observe the claimant over a longer period of time.")  Internal inconsistencies in a treating physician's opinion may provide good reason to deny controlling weight. 20 C.F.R. §404.1527(c)(2); ***Clifford v. Apfel***, 227 F.3d at 863, 871 (7th Cir. 2000).  In addition, "[a]n ALJ may properly reject a doctor's opinion if it appears to be based on a claimant's exaggerated subjective allegations." ***Dixon,*** 270 F.3d at 1178 (*quoting* ***Diaz v.Chater***, 55 F.3d 300, 308 (7th Cir.1995)). How-ever, ALJs may not "succumb to the temptation to play doctor and make their own independent medical findings." ***Rohan v. Chater,*** 98 F.3d 966, 970 (7th Cir. 1996). In addition, the ALJ must "mini-

mally articulate his reasons for crediting or rejecting evidence
of disability." *Clifford*, 227 F.3d at 870.

None of the ALJ's reasons for discounting the testimony of
Jakel-Taylor's physicians has any merit. The ALJ first discred-
ited Dr. Hill because she "makes no mention of the addiction
Jakel-Taylor was undergoing." (Tr. 20) While Dr. Hill's notes do
not make reference to Lortab, this drug was prescribed to Jakel-
Taylor on an ongoing basis for nearly two years after Dr. Hill
saw her, and there is absolutely no evidence on the record that
indicates at what point from 1996-99 Jakel-Taylor became addicted
to the drug.  It is totally inappropriate to discount Dr. Hill's
testimony because she did not cite to an addiction that may not
even have been in existence at the time Dr. Hill saw Jakel-
Taylor.

As for Dr. Hill's failure to cite to the "claimant's behav-
ior that led to her employment termination," the court notes that
the ALJ made no attempt to determine whether Jakel-Taylor did in
fact alter a medical form.  Jakel-Taylor has maintained her
innocence and even testified that her physician claimed responsi-
bility for the misinformation on the form, and Dr. Hill's notes
do reference an "unexpected conflict and confrontation from
employer re: medical leave." (Tr. 20, 241)  In any event, the
ALJ's cryptic statement that Dr. Hill did not "carefully address
the validity of the claimant's reporting and fundamental psycho-
logical forces affecting her" hardly sheds any light on why Dr.
Hill cannot be accorded weight, particularly when Dr. Hill's

diagnosis is the first in a series of consistent conclusions reached by Jakel-Taylor's other physicians. (Tr. 20) The ALJ's apparent attempt to second-guess Dr. Hill's ability to diagnose depression was improper. Regardless of its cause, Jakel-Taylor's depression and Dr. Hill's diagnosis of it is supported by substantial evidence. *See e.g. **Worzalla v. Barnhart**,* 311 F.Supp.2d 782, 795 (E.D. Wis. 2004)("As the Seventh Circuit has noted, depression 'is a mental illness; and health professionals, in particular psychiatrists, not lawyers and judges, are the experts on it.'").

As for Dr. Howard, the ALJ did not provide a simple example in support of his conclusion that Dr. Howard's Mental RFC was inconsistent with his treatment notes, and the court is hard-pressed to find one. In the RFC, Dr. Howard indicated that, while Jakel-Taylor had good ability to function independently, she had poor to no ability to deal with work stresses. Dr. Howard concluded that she was unable to understand and remember even simple job instructions. In the RFC, he attributed these limitations to her inability to concentrate and on-going anxiety and depression. Dr. Howard noted in the RFC that Jakel-Taylor had thoughts of suicide in response to feeling overwhelmed. Similarly, Dr. Howard's treatment notes reference her suicidal ideation. In the notes, Dr. Howard referenced her "great difficulty concentrating," though also recognizing an ability to function independently at home. There is no apparent contradiction between the RFC and the treatment notes.

24

It further defies logic to suggest that Dr. Howard did not "deal with the factor of [Jakel-Taylor's] deceit," as ALJ Bernstein suggests in one section of his opinion, while stating that Dr. Howard "is aware of [Jakel-Taylor's] illegal and anti-social behavior" in another. (Tr. 18, 22) Dr. Howard knew that Jakel-Taylor was suspended from NIPSCO, knew that an arbitrator ruled against her in her appeal, and knew that she had been charged with possession of stolen property. (Tr. 244, 250, 252) The only remaining "deceitful" thing in Jakel-Taylor's past was her arrest for prescription fraud in 1999, which had not occurred when Dr. Howard was treating her. To the extent that the ALJ suggests that Dr. Howard's diagnosis failed to reflect Jakel-Taylor's past, the ALJ again second-guessed a treating physician's ability to diagnose a patient and substituted his own diagnosis for that of Dr. Howard. *See Worzalla*, 311 F.Supp.2d at 797 ("As a professional, the [treating physician] is presumably trained to scrutinize patient statements.") As with Dr. Hill, Dr. Howard's conclusions are well supported and consistent with the balance of the record.

The record contained sparse evidence from Jakel-Taylor's treatment with Dr. Pellow, which the ALJ characterized as "not even minimally useful." (Tr. 23) The records, however, indicated a treatment relationship with Jakel-Taylor that lasted for at least three months. (Tr. 258-61) The ALJ offered no examples to support his conclusion that Dr. Pellow's observations were brief and "dependent upon this unreliable affiant." (Tr. 23)  Further,

if additional records from this three-month period should have been further evaluated, it was incumbent on the ALJ to acquire such records. *See Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004). In fact, in its remand order, the Appeals Council specifically directed the ALJ to obtain additional treatment records if necessary to clarify a physician opinion, which does not appear to have been done.(Tr. 155-56)

The ALJ discounts the last of Jakel-Taylor's treating physicians, Dr. Jayachandran, because his notes failed to reflect Jakel-Taylor's "impending criminal crisis" and "her addiction to opiates," and instead reflected only what she had been telling each of the other therapists. (Tr. 22) The former statements are flatly incorrect; the latter are without support. Jakel-Taylor faced no criminal crisis while seeing Dr. Jayachandran. At that time, she no longer was abusing Lortab.  Finally, though Dr. Jayachandran's records are sparse and the treatment relationship may have been brief, nothing in the records suggests that his statements are not his own.

Finally, as stated above, there was no evidence from any of Jakel-Taylor's treating physicians that was inconsistent with the conclusions of consultative examiners.  The only physician opinion even remotely favorable to the ALJ's decision was that of evaluating physician Dr. Shipley, which the ALJ flatly declined to follow. (Tr. 24-25) By discounting this opinion as well, ALJ Bernstein declined to give controlling weight to every single

26

piece of objective evidence on record, leaving his opinion to
rest solely on his own conclusions.

Jakel-Taylor also contends that the ALJ committed errors
when he rejected her credibility.  The ALJ must determine a
claimant's credibility only after considering all of the claim-
ant's symptoms "and the extent to which [the claimant's] symptoms
can reasonably be accepted as consistent with the objective
medical evidence and other evidence." 20 C.F.R. §404.1529(a).  If
the claimant's impairments reasonably could produce the symptoms
of which the claimant is complaining, the ALJ next must evaluate
the intensity and persistence of the symptoms through consider-
ation of the claimant's "medical history, the medical signs and
laboratory findings, and statements from [the claimant, the
claimant's] treating or examining physician or psychologist, or
other persons about how [the claimant's] symptoms affect [the
claimant]." 20 C.F.R. §404.1529(c)(1).  If the symptoms the
claimant described were not supported by the objective medical
evidence, "the ALJ must obtain detailed descriptions of the
claimant's daily activities by directing specific inquiries"
about the symptoms and their effect on him. *Clifford*, 227 F.3d at
871 (*quoting* *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994)).

While a claimant's complaints of disability cannot be based
on symptoms totally unfounded in medical findings, the ALJ may
not make a credibility determination "solely on the basis of
objective medical evidence." SSR 96-7p, at *1. *See also* *Carradine
v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004)("If pain is dis-

abling, the fact that its source is purely psychological does not disentitle the applicant to benefits."); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). In addition, the ALJ must make more than "a single, conclusory statement . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, at *2. *See* *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001); *Diaz*, 55 F.3d at 307-08 (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence).  The ALJ must "build an accurate and logical bridge from the evidence to [his] conclusion." *Zurawski*, 245 F.3d at 887 (*quoting* *Clifford*, 227 F.3d at 872).  The court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record.  *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Furthermore, the ALJ's "unique position to observe a witness" entitles his opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997).  However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002).

The ALJ's conclusion that Jakel-Taylor's testimony was unreliable did not comport with the standards required by 20 C.F.R. §404.1529 or SSR 96-79. The ALJ did not consider, beyond references to Jakel-Taylor's previous "bad acts," that her testimony was consistent with the medical evidence. While the ALJ is entitled to give Jakel-Taylor's descriptions of her symptoms less weight based on his perceptions of her truthfulness, it is grossly improper to substitute a judgment of morality for an analysis of disability. Here, the ALJ's evident sarcasm towards Jakel-Taylor during the hearings ("I got the tar, you get the feathers"), extensive and irrelevant analogy of prescription fraud to check fraud in his opinion, repeated references to Jakel-Taylor's bad character, and total  failure to compare her alleged symptoms to the evidence of record all indicate that the ALJ improperly based his credibility determination on his own personal beliefs. (Tr. 78)

Even if the ALJ did give Jakel-Taylor diminished credence, he still was not free of his obligations to state the record accurately and to explain why Jakel-Taylor's testimony was inconsistent with that record.  In the course of making his credibility determination, the ALJ's single reference to medical evidence in the record is an incomplete mention of Dr. Nord-strom's MMPI-II results. The ALJ characterized these results as a "failure in the MMPI" that indicated Jakel-Taylor was exaggerat-ing her problems. (Tr. 22-23) In fact, the full results of Dr. Nordstrom's report indicated that she "may be exaggerating

29

problems as a plea for help or may feel confused about her situation." (Tr. 266)  Dr. Nordstrom, with the knowledge of these results, ultimately concluded that she suffered from recurrent major depression and chronic posttraumatic stress disorder. Dr. Nordstrom's report as a whole does not provide the singular support for discounting Jakel-Taylor's credibility that the ALJ has assigned to it.

Likewise, the ALJ stated that Jakel-Taylor's ability to work in a retail setting and her ability to become licensed in real estate demonstrated inconsistency with her claim to suffer from depression. However, the ALJ disregarded the fact that Jakel-Taylor only sold one house in about two years, leaving the job because of her inability to maintain appointments, and that she left her brief job in the retail setting when she suffered a panic attack while working and had to be escorted home. With respect to this event, he stated that "[h]er fearful reaction was associated with embarrassment, not uncontrolled psychopathology. Her reaction was well considered and did not represent a decline in her actual capacity for such work." (Tr. 19)  The ALJ cited to nothing in the record, nor is there anything in the record, to support the ALJ's opinion that Jakel-Taylor's reaction was mere embarrassment. *See* SSR 96-7p at * 4. *See also* **Clifford**, 227 F.3d at 870 ("We have likewise insisted that an ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record.")

Jakel-Taylor further contends that the ALJ improperly concluded that she did not meet the listing requirements described at Listings 12.04 or 12.06. Jakel-Taylor bears the burden of showing presumptive disability at Step Three by demonstrating impairments which meet or equal a Listing. *See* 20 C.F.R. §404.1526(a). *See also **Maggard v. Apfel**,* 167 F.3d 376, 380 (7th Cir. 1999)(*citing **Steward v. Bowen**,* 858 F.2d 1295, 1297 n.2 (7th Cir. 1988)). According to SSR 86-8, "the set of symptoms, signs and laboratory findings in the medical evidence supporting a claim must be compared with, and found to be equivalent in terms of medical severity and duration, to the set of symptoms, signs and laboratory findings specified for a listed impairment." SSR 86-8 at *3; ***Maggard**,* 167 F.3d at 380 ("To meet or equal a listed impairment, the claimant must satisfy all of the criteria of the listed impairment.") The determination of medical equivalence may be made only upon medical evidence "supported by medically acceptable clinical and laboratory techniques" or the "medical opinion given by one or more medical or psychological consultants designated by the Commissioner." 20 C.F.R. §404.1526(b).  However, "[t]he signature of a state agency medical or psychological consultant on . . . a Disability Determination and Transmittal Form . . . ensures that consideration . . . has been given to the question of medical equivalence." SSR 96-6p at *3.

Listing 12.04, Affective Disorders, is met when a claimant is able to show medically documented persistence of depressive syndrome, manic syndrome, or bipolar syndrome. *See* Pt. 404,

31

Subpt. P, App. 1 Listing 12.04(A)(1)-(3). Listing 12.06, Anxiety Related Disorders, requires that a claimant show generalized persistent anxiety, a persistent irrational fear, recurrent severe panic attacks, recurrent obsessions or recurrent and intrusive recollections. *See* Pt. 404, Subpt. P, App. 1 Listing 12.06(A)(1)-(5). Both listings require that the claimant also show a marked difficulty in at least two of the four conditions identically listed with both Listings 12.04 and 12.06 as the "B" factors. *See* Pt. 404, Subpt. P, App. 1 Listing 12.04(B) and 12.06(B). The "B" factors include: 1) Marked restriction of activities of daily living; 2) Marked difficulties in maintaining social functioning; 3) Marked difficulties in maintaining concentration, persistence or pace; and, finally, 4) Repeated episodes of decompensation, each of extended duration. Jakel-Taylor and the Commissioner dispute whether the "B" criteria have been met.

Based upon his reasoning that both Jakel-Taylor and all physicians were not credible, the ALJ discounted significant evidence that supports a conclusion that Jakel-Taylor met the conditions described in the "B" factors.  For example, the ALJ characterized Jakel-Taylor's difficulty with concentration, persistence, and pace (the third "B" factor), as "mild" even though every treating physician who commented on the issue found her completely unable to sustain concentration, and even evaluating physician Dr. Nordstrom found her concentration to be moderately affected.  In support, the ALJ noted her attendance at church, driving, attempts at work and reading novels, among

others. However, an ALJ may not merely list a claimant's daily activities as substantial evidence that she is not disabled "because minimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity." **Clifford**, 227 F.3d at 872. *See also* **Carradine**, 360 F.3d at 755 (finding that the ALJ erred when he "failed to consider the difference between a person's being able to engage in sporadic physical activities and [him] being able to work eight hours a day five consecutive days of the week.").

Furthermore, the court notes that with respect to episodes of deterioration or decompensation in a work-like setting, in addition to Jakel-Taylor's response to her termination, she could not manage in her real estate job, quit her retail position, attempted suicide once, was hospitalized a second time for contemplating suicide, has been unable to maintain steady employment despite repeated attempts, and has had several physicians find her unfit to work. While the occurrences may not qualify as repeated and of extended duration as required under the Listings, they are certainly close.

Finally, as far as the capacity to sustain social functioning, the ALJ acknowledged moderate difficulties based on what the ALJ described as Jakel-Taylor's "embarrassed reaction to encountering acquaintances" from her former employer. (Tr. 19) While recognizing past attempts at suicide and characterizations by her treating physicians as "pathological," the ALJ felt the second criteria was not met because these conditions were the "disas-

33

trous consequences of her own dishonest decisions." (Tr. 19) The
record indicates that Jakel-Taylor experienced significant
periods in which she was unable to attend to social activity,
including an ongoing withdrawal from her friends and the new
tendency of waiting in the car while her daughter shopped.  (Tr.
209-12) In addition, Dr. Howard opined that she had poor to no
ability to relate predictably to social situations. (Tr. 254)

An award of benefits may be ordered by the court only if all
factual issues have been resolved and the record supports a
finding of disability. *Briscoe v. Barnhart*, 425 F.3d 345, 357
(7th Cir. 2005) ("[A] court does not have the authority to award
disability benefits on grounds other than those provided under 42
U.S.C. §423. Subsection (a)(1)(E) requires that the claimant must
be disabled under the Act in order to qualify for benefits.")
(*citing* *Office of Personnel Management v. Richmond*, 496 U.S. 414,
110 S.Ct. 2456, 110 L.Ed.2d. 387 (1990))  The regrettable delay
in the process inflicted upon Jakel-Taylor, now approaching ten
years, and the obduracy of the ALJ cannot stand in as a substi-
tute for disability, but certainly are factors weighing in favor
of an award at this stage. *Briscoe*, 425 F.3d at 356 ("*Wilder* [*v.
Apfel*, 153 F.3d 799 (7th Cir. 1998)] did not hold, however, that
obduracy alone could ever warrant an award of benefits.").

However, stripped of the ALJ's failure to give controlling
weight to Jakel-Taylor's treating physicians, his improper
discounting of her credibility, the thorough substitution of his
own opinions for medical evidence contained in the record, and

34

his disregard of the Appeals Council remand order, the record reveals no unresolved factual issues in need of development through a remand to the administrative agency. Whether on the basis of Jakel-Taylor's testimony and the records of Dr. Howard and Dr. Pellow in support of finding that Jakel-Taylor met a listing requirement, or on the basis of the VE's testimony in response to conditions that were consistently portrayed and unrefuted, the record as a whole warrants the award of benefits pursuant to 42 U.S.C. §405(g), sentence four. *See **Rohan v. Chater***, 306 F.Supp.2d 756, 771 (N.D. Ill 2004) (directing benefits when "[t]he ALJ's opinion . . . was no more reasoned than the one that resulted in the remand, contained misstatements of evidence, ignored the instructions from the court's previous remand order, and relied on evidence not in the record."). *See also **Worzalla***, 311 F.Supp.2d at 801.

————————————

For the foregoing reasons, the Motion for Summary Judgment filed by the plaintiff, Frances Jakel-Taylor, on May 25, 2005 is **GRANTED**. This matter is **REMANDED** with the instruction that Supplemental Security Income and Disability Insurance Benefits be **AWARDED.**

ENTERED this 9th day of May, 2006

s/ ANDREW P. RODOVICH
United States Magistrate Judge

35